MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2020 ME 12
Docket:        Kno-18-138
Argued:        February 7, 2019
Reargued:      June 26, 2019
Decided:       January 28, 2020

Panel:         SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HUMPHREY, and
               CLIFFORD, JJ.
Majority:      SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HUMPHREY, and
               CLIFFORD, JJ.
Concurrence:   CLIFFORD and ALEXANDER, JJ.

# STATE OF MAINE

v.

# RANDALL J. WEDDLE

JABAR, J.

[¶1]  Randall J. Weddle appeals from a judgment of conviction entered by the trial court (Knox County, *Stokes, J.*) as a result of a jury verdict finding him guilty of two counts of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2018), two counts of causing a death while operating under the influence (Class B), 29-A M.R.S. § 2411(1-A)(D)(1-A) (2018), and other related charges.[1]  Weddle

---

[1] Weddle was also convicted of one count of causing injury while operating under the influence (Class C), 29-A M.R.S. § 2411(1-A)(D)(1) (2018), one count of aggravated driving to endanger (Class C), 29-A M.R.S. § 2413(1-A) (2018), one count of driving to endanger (Class E), 29-A M.R.S. § 2413(1) (2018), and eight counts of violations of commercial motor carrier operator rules (Class E), 29-A M.R.S. § 558-A(1)(A) (2018).

contends that the court erred when it denied his motion to suppress the results of a warrantless blood draw taken at the scene of a fatal motor vehicle accident.[2]

[¶2]  Specifically, Weddle argues that 29-A M.R.S. § 2522(2) (2018), which directs law enforcement officers to test the blood of all drivers involved in a fatal, or likely fatal, motor vehicle accident is unconstitutional on its face because it purports to authorize unreasonable searches and seizures in the absence of probable cause, which is inherently unreasonable and therefore in violation of the Fourth Amendment to the United States Constitution.  Although we now agree that section 2522(2) violates the Fourth Amendment and is unconstitutional on its face, we affirm the trial court's denial of Weddle's motion to suppress because we conclude, in the unique circumstances presented by this case, that the "good faith" exception to the exclusionary rule

---

[2] Weddle makes two other assertions of error.  Although we find these challenges unpersuasive, we address them briefly.

First, the trial court acted within its discretion by admitting the documents signed by Weddle and found in his truck as admissions of an opposing party because Weddle was required by law to create the documents as a record of his duty status and retain the documents for inspection.  *See Guardianship of David P.*, 2018 ME 151, ¶ 6, 196 A.3d 896; *State v. Tompkins*, 431 A.2d 619, 620 (Me. 1981); M.R. Evid. 801(d)(2)(A)-(B); 49 C.F.R. §§ 395.8(k)(1), (2), 395.11(c)-(g) (2018) (requiring a logbook and supporting documents).

Second, the trial court correctly denied Weddle's motion for judgment of acquittal because there was sufficient evidence, viewed in the light most favorable to the State, to support the jury's finding that he was guilty of reporting a false duty status in his logbook tracking his hours of operation.  *See State v. Adams*, 2015 ME 30, ¶ 19, 113 A.3d 583; 49 C.F.R. § 395.8(e)(1) (2018) ("No driver or motor carrier may make a false report in connection with a duty status.").

applies to the otherwise unconstitutional search. Accordingly, we affirm the judgment.

## I. BACKGROUND

A. Facts

[¶3] The following facts were found by the suppression court and are supported by competent evidence in the record. *See State v. Turner*, 2017 ME 185, ¶ 2, 169 A.3d 931. On March 18, 2016, law enforcement officers, firefighters, and medical rescue personnel responded to a major motor vehicle accident on Route 17 in Washington, Maine. When they arrived, first responders were faced with an accident scene that involved five vehicles, one of which was engulfed in flames. There were "numerous occupants [of those vehicles] potentially in need of medical care," and two drivers who appeared to be dead. A large tractor trailer was upside down in a ditch alongside Route 17, with its load of lumber strewn across the road and into the ditch. The operator of the tractor trailer, Weddle, was "pinned inside the cab and needed to be extricated."

[¶4] In addition to the accident and its aftermath, the first responders were also faced with the closure of Route 17—the major road between Augusta and Rockland—which "required the management and redirection of a

4

significant flow of traffic travelling east and west at rush hour." In short, the accident scene was "chaotic, confusing, intense and large."

[¶5] A sergeant with the Knox County Sheriff's Department, believing that Weddle may have been responsible for the accident, "decided that it was necessary to preserve any evidence by taking a blood sample from [Weddle]." Prior to the blood draw, the officer did not have information that caused him to believe that there was probable cause to believe that Weddle had been under the influence of alcohol or drugs at the time of the accident. Instead, the officer relied solely upon his knowledge and understanding of Maine's mandatory blood draw statute. *See* 29-A M.R.S. § 2522(2). A second officer of the Knox County Sheriff's Department also testified that he did not believe that he had probable cause to believe that Weddle was operating while impaired.

[¶6] It took approximately an hour to extricate Weddle from his overturned truck. Once extricated, Weddle was immediately placed on a backboard for transport to a hospital via helicopter. While medical personnel were preparing Weddle for transport, the Knox County officer directed an EMT to take a sample of Weddle's blood. At no time before the sample was taken did the officer request a warrant, attempt to gather information regarding Weddle's state of sobriety, or attempt to obtain Weddle's consent.

[¶7]  Several hours later, while Weddle was being treated at the hospital, he consented to law enforcement officers obtaining a second sample of blood from some that had been drawn by hospital personnel.  The results of the hospital sample showed a blood-alcohol content of .07 grams of alcohol per 100 milliliters of blood.  Several days after the accident, during a vehicle autopsy on Weddle's truck, law enforcement officers discovered a three-quarters-full bottle of Crown Royal whiskey and a shot glass in the cab of the truck.

B.     Procedure

[¶8]  In April 2016, Weddle was charged by complaint with two counts of manslaughter and two counts of causing a death while operating under the influence, and a warrant was issued for his arrest.  Weddle was subsequently charged by indictment with two counts of manslaughter (Class A), 17-A M.R.S. § 203(1)(A), two counts of causing a death while operating under the influence (Class B), 29-A M.R.S. § 2411(1-A)(D)(1-A), one count of causing injury while operating under the influence (Class C), 29-A M.R.S. § 2411(1-A)(D)(1) (2018), one count of aggravated driving to endanger (Class C), 29-A M.R.S. § 2413(1-A) (2018), one count of driving to endanger (Class E), 29-A M.R.S. § 2413(1) (2018), and eight counts of violations of commercial motor carrier operator

6

rules (Class E), 29-A M.R.S. § 558-A(1)(A) (2018): operating with impaired ability or alertness, operating with a detectable presence of alcohol, possession or use of alcohol while on duty, and five counts of making a false report in connection with a duty status.

[¶9] Weddle pleaded not guilty and moved to suppress the results of the blood draw taken at the accident scene.[3] The trial court denied the motion. A five-day jury trial was held in January 2018, following which the jury returned a verdict of guilty on all counts. The trial court sentenced Weddle to thirty years' incarceration, with all but twenty-five years suspended, and four years' probation after release, and imposed a fine. Weddle timely appealed. *See* 15 M.R.S. § 2115 (2018); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

A.     Title 29-A M.R.S. § 2522

[¶10] On appeal, Weddle's main argument is that 29-A M.R.S. § 2522 is unconstitutional and that the motion court erred by denying his motion to suppress the results of the warrantless blood draw taken in accordance with that statute.

---

[3] Weddle also moved to suppress the results of the vehicle search, medical records, and statements made to police officers while he was being treated at the hospital. The trial court denied these motions and Weddle does not appeal from those denials.

[¶11]  Section 2522(1) requires every driver involved in a fatal, or likely fatal, motor vehicle accident to "submit" to testing that will allow the State to determine if there was alcohol or drugs in his or her system at the time of the accident:

> **1. Mandatory submission to test.** If there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test, as defined in section 2401, subsection 3, to determine an alcohol level or the presence of a drug or drug metabolite in the same manner as for OUI.

Although a "chemical test" is defined as "a test or tests used to determine alcohol level or the presence of a drug or drug metabolite by analysis of blood, breath, or urine," 29-A M.R.S. § 2401(3) (2018), section 2522(2) explicitly directs that law enforcement officers "*shall* cause a *blood* test to be administered":

> **2. Administration of test.** The investigating law enforcement officer shall cause a blood test to be administered to the operator of the motor vehicle as soon as practicable following the accident and may also cause a breath test or another chemical test to be administered if the officer determines appropriate.  The operator shall submit to and complete all tests administered . . . .

Finally, the statute provides that the result of a test taken pursuant to section 2522(1)—blood, breath, or urine—may be admissible in a subsequent prosecution:

> **3. Admissibility of test results.** The result of a test is admissible at trial if the court, after reviewing all the evidence, whether gathered prior to, during or after the test, is satisfied that probable cause exists, independent of the test result, to believe that the operator was under the influence of intoxicants at the time of the accident.

29-A M.R.S. § 2522(3) (2018).

[¶12]  We review the constitutionality of a statute de novo as a matter of law.  *See State v. Nisbet*, 2018 ME 113, ¶ 16, 191 A.3d 359.  To establish that the statute is unconstitutional on its face, it is Weddle's burden to show that there are "no circumstances in which it would be valid."  *Conlogue v. Conlogue*, 2006 ME 12, ¶ 5, 890 A.2d 691; *see Bouchard v. Dep't of Pub. Safety*, 2015 ME 50, ¶ 8, 115 A.3d 92.  It is a "heavy burden . . . since all acts of the Legislature are presumed constitutional."  *Bouchard*, 2015 ME 50, ¶ 8, 115 A.3d 92 (quotation marks omitted).

[¶13]  *If* probable cause were present here before the blood draw, in what were clearly exigent circumstances, or if the special needs doctrine applied, *see infra* ¶¶ 16-21, then we could avoid the constitutional issue and uphold the motion justice's denial of the motion to suppress on other grounds.  *See, e.g., State v. Christen*, 1997 ME 213, ¶ 8, 704 A.2d 335 (explaining that we "avoid expressing opinion on constitutional law whenever a nonconstitutional resolution of the issues renders a constitutional ruling unnecessary")

(quotation marks omitted). However, we must decide the case before us, and the record definitively forecloses the application of the special needs doctrine and the existence of probable cause prior to the blood draw. Therefore, we must focus on the facial constitutionality of section 2522, which mandates the drawing of blood without any requirement of probable cause *before* the blood draw.

B.  Absence of Probable Cause

[¶14]  There is hardly a principle of constitutional law more firmly entrenched than the requirement that law enforcement officers may conduct a search only when they have probable cause to believe that a crime has been committed. *See, e.g., State v. Martin*, 2015 ME 91, ¶ 8, 120 A.3d 113 (stating that a warrantless search is not unreasonable "if it is supported by probable cause and exigent circumstances exist") (quotation marks omitted); *Chambers v. Maroney*, 399 U.S. 42, 51 (1970) ("In enforcing the Fourth Amendment's prohibition against unreasonable searches and seizures, the [Supreme] Court has insisted upon probable cause as a minimum requirement for a reasonable search permitted by the Constitution."); *United States v. Place*, 660 F.2d 44, 47 (2d Cir. 1981) ("Even in those rare instances where warrantless seizures are permitted . . . the police must still have probable cause . . . ."); *Fisher v. Volz*, 496

F.2d 333, 339 (3d Cir. 1974) ("Of course, the Supreme Court has recognized exceptions to the requirement of a search warrant, but the Court has been quite clear that these exceptions, based upon exigent circumstances, do not dispense with the requirement of probable cause.") (quotation marks omitted); *People v. Scott*, 227 P.3d 894, 898 (Colo. 2010) (explaining that "[o]f course, probable cause cannot be established after the search"). We could not find any case that allowed probable cause to be established *after* the search or seizure.

[¶15]  All evidence of Weddle's possible intoxication—the bottle of whiskey, subsequent blood test results, and the testimony of eyewitnesses— was gathered *after* Weddle's blood was drawn and cannot be used to justify the search. This evidence obtained after the blood draw was the basis for the motion court's denial of Weddle's second motion to suppress.

C.    Special Needs Doctrine

[¶16] The only exception to the warrant requirement that contemplates a search in the absence of the constitutional requirement of probable cause is the special needs doctrine. The special needs doctrine refers to "special needs, beyond the normal need for law enforcement, [that] make the warrant and probable-cause requirement impracticable." *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (*Blackmun, J.*, concurring).

[¶17]  The most important aspect of the doctrine "lies in the nature of the 'special need' asserted as justification for the warrantless search[]." *Ferguson v. City of Charleston,* 532 U.S. 67, 79 (2001)*.*  In *Skinner* v. *Railway Labor Executives' Association*, 489 U.S. 602, 620 (1989), where a railroad regulation required the testing of railroad employees' blood following serious train accidents, it was the "[g]overnment's interest in regulating the conduct of railroad employees to ensure safety . . . [that] present[ed] 'special needs' beyond normal law enforcement . . . [and] justif[ied] departure[] from the usual warrant and probable-cause requirements" (quotation marks omitted).  The regulation was promulgated "not to assist in the prosecution of employees, but rather to prevent accidents and casualties from railroad operations that result in impairment of employees by alcohol or drugs."  *Id.* at 620-21 (quotation marks omitted).  The *Skinner* decision, which we relied on in the 2007 *Cormier* decision,[4] included no discussion indicating that the results from those blood tests were used for law enforcement purposes.  *Id.* at 606-07, 610-11, 620-21.  The only consequences flowing from the results of the blood tests that the Supreme Court was aware of were related to disciplinary proceedings, and the primary purpose of the tests was to dissuade the use of intoxicants by railroad

---

[4]  *See infra* ¶¶ 22-26.

employees. *Id.* at 610-11, 620-21 ("The [Federal Railroad Administration] has prescribed toxicological tests, not to assist in the prosecution of employees, but rather to prevent accidents and casualties in railroad operations that result from impairment of employees by alcohol or drugs.") (quotation marks omitted).

[¶18] In contrast, in *Ferguson v. City of Charleston*, decided after *Skinner*, the Supreme Court held that a state hospital policy requiring the diagnostic testing of pregnant women meeting certain criteria, such as history of drug abuse, could not be justified by the special needs exception because the results of the warrantless blood tests were frequently handed over to law enforcement. 532 U.S. at 84-86. "While the ultimate goal of the program may well have been to get the women in question into substance abuse treatment and off of drugs, the immediate objective of the searches was to generate evidence *for law enforcement purposes* in order to reach that goal." *Id.* at 82-83 (emphasis in original). As the Supreme Court explained, the "stark and unique fact that characterizes [*Ferguson*] is that [the policy] was designed to obtain evidence of criminal conduct by the tested patients that would be turned over to the police and that could be admissible in subsequent criminal prosecutions." *Id.* at 85-86.

[¶19]  The warrantless blood draw mandated by section 2522(2), much like the hospital policy in *Ferguson*, has a clear law enforcement purpose.  The statute requires that law enforcement "shall cause" the administration of a blood test and describes when the results from those tests are admissible at trial.  *See* 29-A M.R.S. § 2522(2), (3).  While "[t]he threat of law enforcement may ultimately have been intended as a means to an end"—addressing the problem of intoxicated driving—"the immediate objective of the search[] [is] to generate evidence for *law enforcement purposes* in order to reach that goal." *Ferguson*, 532 U.S. at 83-84 (emphasis in original).

[¶20]  Neither the "magnitude of the drunken driving problem [n]or the State['s] interest in eradicating it," *Missouri v. McNeely*, 569 U.S. 141, 160 (2013) (quotation marks omitted), is disputed.  Nor do we minimize the challenges facing law enforcement at the scene of a fatal or potentially fatal accident scene.  Nevertheless, "the general importance of the government's interest in this area does not justify departing from the warrant requirement . . . ." *Id.*  Nor does "the fact that people are accorded less privacy in automobiles because of the compelling governmental need for regulation . . . diminish a motorist's privacy interest in preventing an agent of the government from piercing his skin." *Id.* at 159 (alterations omitted) (quotation marks omitted).

14

[¶21] Section 2522 does not advance a "'special need' . . . divorced from the State's general interest in law enforcement" that justifies a departure from the Fourth Amendment's requirements of a warrant and individualized suspicion. *Ferguson*, 532 U.S. at 79. "[G]iven the extensive involvement of law enforcement officials at every stage," section 2522 "does not fit within the closely guarded category of 'special needs,'" *id.* at 84, and the statute cannot be constitutionally sustained on that basis.

D. *State v. Cormier*

[¶22] In a 2007 decision, *State v. Cormier*, we upheld the constitutionality of a warrantless blood draw taken pursuant to section 2522, notwithstanding the absence of probable cause at the time of the search and despite an acknowledgment that none of the traditional exceptions to the warrant requirement applied. 2007 ME 112, ¶ 18, 928 A.2d 753.

[¶23] As to the probable cause requirement, we opined that the statute allowed for a determination of previously existing probable cause after the search, rather than before, when "but for the exigencies at the scene of the collision, probable cause for the test would have been discovered" and "the test would have been administered based on the probable cause established by this independent lawfully obtained information." *Id.* ¶ 26. As to the requirement of

a warrant or the application of an exception to the warrant requirement, we determined that a combination of the exigent circumstances present at the scene of a fatal accident and the inevitable discovery doctrine[5] rendered a warrantless blood draw reasonable in the narrow circumstances contemplated by section 2522. *Id.* ¶¶ 20-27. As an alternative, we also held that "[t]he State's special needs, separate from the general purpose of law enforcement, justify an exception to the warrant requirement in these circumstances."[6] *Id*. ¶ 36.

[¶24] Two dissenting justices, however, took the position that section 2522 is unconstitutional on its face. *Id.* ¶ 59 (*Levy, J.*, dissenting). In the dissenting justices' view, the application of a "new theory" combining exigent circumstances and inevitable discovery could not salvage section 2522. *Id.* ¶ 53. Specifically, the dissent noted that the inevitable discovery rule was not applicable as it "is physically impossible for the same sample to be subsequently and inevitably discovered later in time because of the effect that

---

[5] The inevitable discovery doctrine is an exception to the exclusionary rule that allows for the "admission of evidence obtained without a warrant if (1) the evidence could also have been gained lawfully from information that is truly independent from the warrantless search, and (2) the evidence inevitably would have been discovered by such lawful means." *State v. Cormier*, 2007 ME 112, ¶ 17, 928 A.2d 753; *see also State v. St. Yves*, 2000 ME 97, ¶ 18 & n.7, 751 A.2d 1018.

[6] Also based on the special needs exception, we have previously upheld the constitutionality of section 2522's predecessor, 29 M.R.S.A. § 1312(8), (11), *repealed by* 1993 P.L. c. 683. *See State v. Roche*, 681 A.2d 472, 475 (Me. 1996); *see also State v. Bento*, 600 A.2d 1094, 1096-97 (Me. 1991) (holding that section 1312 does not require probable cause of intoxication prior to the blood draw, only before admittance at trial, but declining to reach the constitutionality of the statute).

the passage of time has on an operator's blood-alcohol content," and that the exigent circumstances exception to the warrant requirement applies only when there "is adequate probable cause for the seizure and insufficient time for the police to obtain a warrant." *Id.* ¶¶ 55, 57 (quotation marks omitted). The dissenting justices also concluded that the primary purpose of section 2522 was clearly to gather evidence for law enforcement purposes; a purpose that is at odds with the requirements of the special needs exception. *Id.* ¶ 52.

[¶25] For clarification, we note that *Cormier* did not apply the traditional exigent circumstances *exception*, which requires both exigent circumstances *and probable cause* prior to the warrantless search or seizure. *See id.* ¶ 18 ("We recognize that a search authorized by section 2522 does not fall neatly into either of these exceptions. . . . The exigent circumstances exception is ordinarily applicable to a search conducted after determining the existence of probable cause but before a warrant can be obtained."). Rather, in *Cormier* we acknowledged that, in crafting section 2522, the Legislature had determined that a fatal accident presented circumstances requiring immediate blood testing "without the ordinary pause to collect evidence relevant to whether alcohol or drugs might have impaired the driver" necessary to establish probable cause. *Id.* ¶ 20.

[¶26]  As Weddle argues, in the years since *Cormier* was decided, the United States Supreme Court has issued several decisions providing further guidance on the use of warrantless blood tests.  *See e.g., Birchfield v. North Dakota*, --- U.S. ---, 136 S. Ct. 2160 (2016); *McNeely*, 569 U.S. 141 (2013).  These decisions highlight the important privacy interest that a person holds in his or her blood and, based on those decisions, we take this opportunity to revisit our decision in *Cormier*.  In doing so, we conclude that the approach taken in *Cormier* is no longer viable and does not reflect the "most personal and deep-rooted expectations of privacy" that a person holds in preventing the government from "intru[ding] beneath [his] skin and into his veins to obtain a sample of his blood for use as evidence in a criminal investigation," *McNeely*, 569 U.S. at 148 (quotation marks omitted).  Notwithstanding the Legislature's recognition of a serious law enforcement problem, the statute runs afoul of the U.S. Constitution.  There is no way to avoid addressing the constitutionality of 2522.

E.    Constitutionality of Maine's Mandatory Blood Test Statute

[¶27]  In this case, the Knox County officer obtained a sample of Weddle's blood in accordance with section 2522(2).  There is no dispute that prior to the blood draw, the officer did not request or obtain a warrant for the blood test

18

taken at the scene of the accident, did not obtain Weddle's consent for that blood test, and did not have probable cause to believe that Weddle was under the influence at the time of accident. In determining that the results of the blood test taken at the scene of the accident were admissible, the motion court found that the law enforcement officer acted pursuant to section 2522 and that 2522 was constitutional.

[¶28] Section 2522(3) authorizes the establishment of probable cause that "existed" at the time of the blood draw after the fact; that is, after the blood draw had already been conducted. As a result, we conclude that section 2522 cannot be constitutionally sustained because it allows a search in the form of an intrusive, nonconsensual blood draw in the absence of probable cause— determined *before* the search is conducted. The specific blood draw in this case taken pursuant to 2522 requires the same conclusion.

[¶29] We conclude that 29-A M.R.S. §§ 2522(2) and (3) are unconstitutional. The statute does not require that law enforcement have consent or probable cause to believe that a driver is impaired before drawing a person's blood. Moreover, the statute is clearly intertwined with law enforcement purposes, making the special needs doctrine inapplicable. To the

extent that this opinion conflicts with the *Cormier* decision, *Cormier* is overruled.

[¶30]  Weddle's blood was taken without a warrant, without his consent, and without probable cause to believe that he was impaired by alcohol at the time his blood was drawn.  No exception to the Fourth Amendment's warrant requirement applies.  Therefore, the warrantless blood draw performed at the scene of the accident pursuant to 29-A M.R.S. § 2522 violated Weddle's Fourth Amendment right to be free from unreasonable searches and seizures.

F.    The Exclusionary Rule and the Good Faith Exception

[¶31]  Because we hold that Weddle's Fourth Amendment rights were violated by the blood draw at the scene of the accident, we must determine what the appropriate remedy is.  Generally, "[w]hen evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure." *Illinois v. Krull*, 480 U.S. 340, 347 (1987).

[¶32]  The purpose of the exclusionary rule is "to deter future unlawful police conduct and thereby effectuate the guarantee of the Fourth Amendment against unreasonable searches and seizures." *United States v. Calandra*, 414 U.S. 338, 347 (1974).  The rule "is neither intended nor able to cure the invasion of

the defendant's rights which he has already suffered." *United States v. Leon*, 468 U.S. 897, 906 (1984) (quotation marks omitted). Instead, the rule acts as a remedial device that "safeguard[s] Fourth Amendment rights generally through its deterrent effect, rather than [as] a personal constitutional right of the party aggrieved." *Calandra*, 414 U.S. at 348. "As with any remedial device, application of the exclusionary rule properly has been restricted to those situations in which its remedial purpose is effectively advanced." *Krull*, 480 U.S. at 347.

[¶33] In determining whether the purposes of the exclusionary rule would be served in a specific case, the Supreme Court has "examined whether the rule's deterrent effect will be achieved" and "weigh[s] the likelihood of such deterrence against the costs of withholding reliable information from the truth-seeking process." *Id.* The Supreme Court has stated that

> because the purpose of the exclusionary rule is to deter police officers from violating the Fourth Amendment, evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment. Where the officer's conduct is objectively reasonable . . . excluding the evidence will not further the ends of the exclusionary rule in any appreciable way; for it is painfully apparent that the officer is acting as a reasonable officer would and should act in similar circumstances. Excluding the evidence can in no way affect his future conduct unless it is to make him less willing to do his duty.

*Id.* at 348-49 (alterations omitted) (quotation marks omitted). Thus, some jurisdictions have recognized a good faith exception to the exclusionary rule, by which the results of an illegal search are nonetheless admissible at trial because the purpose of the exclusionary rule would not be served by the exclusion of that evidence—i.e., when the evidence was obtained "in the reasonable good-faith belief that a search or seizure was in accord with the Fourth Amendment." *Leon*, 468 U.S. at 909 (quotation marks omitted).

[¶34] In Maine, we have not previously adopted the good faith exception to the exclusionary rule, but we have acknowledged the Supreme Court's and other jurisdictions' application of the exception in various contexts. *See e.g., State v. Nunez*, 2016 ME 185, ¶¶ 1 n.1, 16-17 & n.8, 153 A.3d 84; *State v. Estabrook*, 2007 ME 130, ¶ 1, 932 A.2d 549. In many instances, the good faith exception has been applied when an officer, acting in good faith, relies upon a search warrant that is faulty for some reason not apparent to the officer. *See, e.g., Leon*, 468 U.S. at 920-21. However, the Supreme Court has also applied the good faith exception to situations where an officer has obtained evidence by acting in "objectively reasonable reliance on a statute." *Krull*, 480 U.S. at 349. In such cases, "[u]nless a statute is clearly unconstitutional, an officer cannot be expected to question the judgment of the legislature that passed the law," and

application of the exclusionary rule would not serve its purpose of deterrence. *Id.* at 349-50. "A statute cannot support objectively reasonable reliance if, in passing the statute, the legislature wholly abandoned its responsibility to enact constitutional laws. Nor can a law enforcement officer be said to have acted in good-faith reliance upon a statute if its provisions are such that a reasonable officer should have known that the statute was unconstitutional." *Id.* at 355.

[¶35] Accordingly, the good faith exception has been applied when a law enforcement officer reasonably relies, in good faith, on a statute or common law rule that the officer has no reason to believe was unconstitutional and which has previously been declared constitutional by an appellate court with binding authority. *See Davis v. United States*, 564 U.S. 229, 241 (2011) ("Evidence obtained during a search conducted in reasonable reliance on binding precedent is not subject to the exclusionary rule."); *State v. Ward*, 604 N.W.2d 517, 525-31 (Wis. 2000) (applying the good faith exception when officers executed a search pursuant to a no-knock police entry policy that had been twice approved by the state's highest court).

[¶36] Although we have not previously relied on the good faith exception, we do so today because, in these unique circumstances, the suppression of the results of the warrantless blood draw would not serve the

purpose of the exclusionary rule. The officer who ordered Weddle's blood draw acted in good faith reliance on a statute blessed as constitutional as recently as 2007, *Cormier*, 2007 ME 112, ¶ 37, 928 A.2d 753, and whose predecessor statute we also upheld in *State v. Roche*, 681 A.2d 472, 475 (Me. 1996). Further, we note our own recent inability to reach a consensus on the handling of blood draws, *see State v. LeMeunier-Fitzgerald*, 2018 ME 85, ¶¶ 33-46, 188 A.3d 183 (Gorman, J., dissenting); *id.* ¶¶ 47-56 (Jabar, J., dissenting); *id.* ¶¶ 57-60 (Hjelm, J., dissenting), and, as shown in the Concurring Opinion, the view that section 2522 is constitutional still has some support, *see* Concurring Opinion ¶ 40. Given the unique fact pattern in this case, and the history of section 2522, suppression would serve no purpose other than to "withhold[] reliable information from the truth-seeking process" and punish an officer for performing his duty. *Krull*, 480 U.S. at 347.

[¶37] We therefore conclude, in this highly unusual and exceptional circumstance, that the exclusionary rule does not prohibit the admission of the results of the blood draw because the officer who ordered that draw reasonably did so in good faith reliance on section 2522 and our prior decisions.

## III. CONCLUSION

[¶38] Although Weddle's Fourth Amendment rights were violated by the warrantless drawing of his blood at the scene of the fatal accident, the good faith exception to the exclusionary rule applies. Accordingly, we conclude that the trial court did not err by denying Weddle's motion to suppress the results of the blood test. *See, e.g., State v. Watson*, 2016 ME 176, ¶ 10, 152 A.3d 152 (stating that we may affirm the trial court on different grounds as a matter of law); *State v. Adams*, 2015 ME 30, ¶ 15 n.4, 113 A.3d 583 (same).

The entry is:

Judgment affirmed.

---

CLIFFORD, J., with whom ALEXANDER, J., joins, concurring.

[¶39] I concur with the Court that the judgment of the trial court should be affirmed, and that it can be affirmed pursuant to the good faith exception to the warrant requirement.

[¶40] I disagree with the Court, however, that 29-A M.R.S. § 2522 (2018) is unconstitutional. I write separately because I conclude that, whether or not there was probable cause to believe that other crimes had been committed, the search here was reasonable for purposes of determining whether Weddle had

been operating under the influence. In the extreme exigent circumstances that existed in this case, the blood draw from Weddle without a warrant—when a first responder had probable cause to believe that Weddle was under the influence at the time of the blood draw but did not disclose that information to law enforcement until after the blood draw—was objectively reasonable under the Fourth Amendment. Therefore, the test results from that blood draw were properly admitted as evidence against Weddle at his trial.

[¶41] Rigorous standards must be met before declaring a statute unconstitutional on its face. *Guardianship of Chamberlain*, 2015 ME 76, ¶¶ 8-10, 118 A.3d 229. "As the Supreme Court of the United States has stated, 'facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution.'" *Id.* ¶ 9 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451 (2008)). Because we pay deference to the Legislature's enactments, "a party mounting a facial challenge must demonstrate that 'no set of circumstances exists under which the [statute] would be valid.'" *Id.* ¶ 10 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). "Thus, a facial challenge will be considered only if there is a reasoned

argument that a challenged statute cannot be applied constitutionally on any set of facts." *Id.*

[¶42]  The statute at issue here, 29-A M.R.S. § 2522(1), provides, "If there is probable cause to believe that death has occurred or will occur as a result of an accident, an operator of a motor vehicle involved in the motor vehicle accident shall submit to a chemical test . . . to determine an alcohol level or the presence of a drug or drug metabolite in the same manner as for OUI."  Mindful of the United States and Maine Constitutions' prohibitions against unreasonable searches, the Legislature provided protections for persons searched: "The result of a test is admissible at trial if the court, after reviewing all the evidence, whether gathered prior to, during or after the test, is satisfied that probable cause exists, independent of the test result, to believe that the operator was under the influence of intoxicants at the time of the accident." 29-A M.R.S. § 2522(3).

[¶43]  In essence, section 2522 treats the circumstances as exigent in those narrow cases where there is probable cause to believe that an accident has resulted or will result in death.  It authorizes law enforcement officers to obtain drivers' blood, with any evidence establishing probable cause for that search to be collected before, during, or after the blood draw, so that the

immediate priorities attendant to the accident can be addressed; and it recognizes the special needs of the government, apart from law enforcement purposes, to determine the level of alcohol or of drug metabolites in the blood of a driver, including a professional driver as in this case,[7] for purposes of understanding the scope of alcohol- and drug-related fatalities. *See* 29-A M.R.S. § 2522(1), (3); *see also State v. Cormier*, 2007 ME 112, ¶¶ 17-37, 928 A.2d 753.

[¶44]    In the present case, the legislatively contemplated exigencies abound, and the facts vividly demonstrate how the challenged statute *can* be applied constitutionally.  When the first responders came upon the scene of the horrific, five-vehicle crash, one person was in a car that was fully engulfed in flames; another person in a severely damaged vehicle appeared to be dead; and Weddle was pinned, upside down, in the cab of the truck he had been driving. Responding personnel included numerous law enforcement officers, many firefighters and EMTs, three ambulances, and two LifeFlight helicopters.

---

[7]  The Court acknowledges that the government's interest in misconduct by a professional driver is similar to its interest with respect with a professional railroad operator, as in *Skinner v. Railway Labor Executives' Association*, 489 U.S. 602, 633-34 (1989).  Court's Opinion ¶ 17.  Thus, whether or not a nonprofessional driver in the same situation would be subject to search, the Court should conclude that the statute is constitutional as applied in this case. *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (stating that that a statute is facially unconstitutional only if "no set of circumstances exists under which the Act would be valid").

[¶45] Given these serious circumstances, in which there was probable cause to believe that death had occurred or would occur as a result of a crash in which the driver was involved, the officer conducted a reasonable search, authorized by statute, when the officer obtained a blood sample without first investigating for probable cause of intoxication or impairment. U.S. Const. amend. IV; Me. Const. art. I, § 5; *see* 29-A M.R.S. § 2522(1). In authorizing this blood draw, the statute enables officers to prioritize their tasks based on the urgent needs at the scene. Most importantly, when law enforcement officers arrive at the scene of such an accident, they must cooperate with other first responders to tend to injured and dying individuals, remove them from damaged vehicles, and secure treatment for the injured. Concurrently, law enforcement officers must secure the scene while responders extinguish any fires and contain any hazardous material spills, and must protect the safety of those involved in the accident and the public on the road. Then, the officers must see to the removal of damaged vehicles from the scene and the reopening of the road for travel. Only after those urgent tasks are completed can law enforcement focus on investigating to identify causes and assess responsibility for the accident.[8]

---

[8] It is also it is important for the authorities to identify causes and assess responsibility for the accident to determine if flaws in the design, construction or maintenance of the road or the involved

[¶46] Neither the United States Constitution nor the Maine Constitution requires otherwise. Our constitutions do not require officers to risk forfeiting the capacity to determine criminal responsibility if they tend to the injured and act to protect public safety. Taking Weddle's blood sample, in the life-threatening circumstances addressed by 29-A M.R.S. § 2522, when probable cause that existed and was known to another first responder *before* the blood draw but was not known to law enforcement until *after* the blood draw, did not constitute an unreasonable search pursuant to the Fourth Amendment.

[¶47] The less invasive, but more time-consuming, chemical breath test is not feasible to administer at the scene of an accident at which there is probable cause to believe that individuals may be dead or dying, and that test would not detect drug metabolites.[9] Laws calling for blood draws in the uncommon event of a crash resulting in death or serious injury contemplate that a "a blood test, unlike a breath test, may be administered to a person who is unconscious (perhaps as a result of a crash) or who is unable to do what is

---

vehicles may have contributed to the accident and use knowledge gained from the accident to improve safety education about ways to avoid such tragedies.

  [9] Nor are the machines used to test blood-alcohol content from deep lung breath likely to be available either at the scene of the crash or at the hospital.

needed to take a breath test due to profound intoxication or injuries."[10] *Birchfield v. North Dakota*, --- U.S. ---, 136 S. Ct. 2160, 2184-85 (2016); *see also Mitchell v. Wisconsin*, --- U.S. ---, 139 S. Ct. 2525, 2531 (2019) (plurality opinion) ("When police have probable cause to believe a person has committed a drunk-driving offense and the driver's unconsciousness or stupor requires him to be taken to the hospital or similar facility before police have a reasonable opportunity to administer a standard evidentiary breath test, they may almost always order a warrantless blood test to measure the driver's BAC without offending the Fourth Amendment.").

[¶48]  Furthermore, in the event of a fatal crash, police may not immediately be able to distinguish between intoxication and injury, especially if the driver was using drugs that do not emit any odor.  Given the extenuating circumstances presented by a crash believed to have caused fatalities, there are more pressing needs than seeking evidence of drug or alcohol consumption, and if a person requires critical medical attention as did Weddle, a blood draw is almost always necessary—independent of any criminal investigation—for

---

[10]  Unconscious drivers and the families of deceased drivers may also lament that blood was not drawn immediately to establish driver sobriety.  We should not presume that all drivers would refuse consent if they were living, conscious, and capable of responding to officers' questions.

purposes of treatment, such that the intrusion into the body is inevitable. *See Mitchell*, 139 S. Ct. at 2538-39.

[¶49]  In Maine, the Legislature has acknowledged the many realities that courts must consider in determining whether a blood draw is reasonable for purposes of the Fourth Amendment—that "[d]riving in Maine is not a right but a privilege," *Carrier v. Sec'y of State*, 2012 ME 142, ¶ 16, 60 A.3d 1241; that drivers' expectations of privacy when exercising the privilege of driving on Maine roads are limited if a fatal, or likely fatal, crash has occurred; that fatal crashes inherently present exigent circumstances in which law enforcement officers must be allowed to prioritize the most pressing life and safety needs; that officers should not, in prioritizing those needs, be forced to prioritize searching for and collecting evidence of intoxication over assisting individuals who are injured and possibly dying; and that obtaining driver sobriety or intoxication information in fatal accidents helps the government understand the extent to which alcohol-impaired driving causes deaths on Maine's roads for purposes of setting policies and gauging their effectiveness. *See Cormier*, 2007 ME 112, ¶¶ 19-23, 36, 928 A.2d 753.

[¶50]  In responding to these realities, the Legislature did not overlook the important, constitutionally recognized privacy interest of the driver whose

blood is drawn. *See Missouri v. McNeely*, 569 U.S. 141, 159 (2013). As noted previously, the results of blood testing are inadmissible at trial unless— independent of the test results themselves—there is evidence establishing probable cause to believe that the driver was operating under the influence. *See* 29-A M.R.S. § 2522(3). This feature of the statute protects drivers from the consequences of the search if, once the government has completed its investigation after attending to the emergency, it cannot establish independent probable cause in support of the search.

[¶51] Although my colleagues contend that the Supreme Court's decision in *Missouri v. McNeely* invalidates section 2522, the Court did not in *McNeely* consider a circumstance in which blood was drawn at the scene of a crash at which there was probable cause to believe a death had occurred or would occur.[11] 569 U.S. at 145-46; *cf. Schmerber v. California*, 384 U.S. 757, 758-59, 771-72 (1966) (holding that the Fourth Amendment had not been violated when a driver's blood was drawn at a hospital after a traffic accident).

[¶52] Section 2522 does not create the type of overgeneralized or wide-sweeping process that the Supreme Court has rejected for ordinary traffic

---

[11] Nor did any of the cases considered in *Birchfield* involve law enforcement response to an accident at which there was probable cause to believe a fatality had occurred or would occur. *See Birchfield v. North Dakota*, 136 S. Ct. 2160, 2170-2172 (2016).

stops. *See McNeely*, 569 U.S. at 153-56. It is instead a procedure that law enforcement officers will use in narrowly limited circumstances that present a dire emergency. As Justice Kennedy's concurring opinion makes clear, the Court did not, in *McNeely*, invalidate statutes that "adopt rules, procedures, and protocols that meet the reasonableness requirements of the Fourth Amendment and give helpful guidance to law enforcement officials." *Id.* at 166 (Kennedy, J., concurring in part). For these reasons, I would not overrule *Cormier*, which addresses a life-and-death situation that is altogether different from the traffic-stop situations addressed in *McNeely* and *Birchfield*.

[¶53] I would conclude that, in the circumstances of the serious accidents contemplated by Maine's statute, the Legislature has acted reasonably in providing law enforcement officers—and the public—with clear rules about what testing may be expected and when. In this narrowly defined emergency situation, asking the officers to decide priorities on a case-by-case basis is dangerous and ill-advised. *McNeely* requires an officer to obtain a warrant if it can be obtained "without significantly undermining the efficacy of the search." 569 U.S. at 152. At the scene of a deadly crash, asking officers to stop and assess the need for further investigation or a warrant while people may be dying is both short-sighted and *un*reasonable.

34

[¶54]   I agree with the motion court that 29-A M.R.S. § 2522 is not unconstitutional, either facially or as applied, because in the context of the fatal accident, the drawing of Weddle's blood did not constitute an unreasonable search pursuant to the Fourth Amendment.   The Court's reasoning declaring section 2522 unconstitutional simply does not meet the rigorous standard we articulated in *Chamberlain* that for "declarations of constitutional invalidity, a party mounting a facial challenge must demonstrate that 'no set of circumstances exists under which the [statute] would be valid.'"  2015 ME 76, ¶ 10, 118 A.3d 229 (quoting *Salerno*, 481 U.S. at 745).

[¶55]  I therefore concur in the result of the Court's opinion but not in the Court's analysis of the statute's constitutionality.

---

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, for appellant Randall J. Weddle

Jonathan Liberman, District Attorney, and Jeffrey E. Baroody, Dep. Dist. Atty. (orally), Prosecutorial District VI, Rockland, for appellee State of Maine

Aaron M. Frey, Attorney General, and Jeffrey E. Baroody, Asst. Atty. Gen. (transfer during pendency of appeal), Office of the Attorney General, Augusta, for appellee State of Maine

Lawrence C. Winger, Esq., Portland, for amicus curiae Lawrence C. Winger

Emma E. Bond, Esq., and Zachary L. Heiden, Esq., American Civil Liberties Union of Maine Foundation, Portland, for amicus curiae American Civil Liberties Union of Maine Foundation

Jamesa J. Drake, Esq., Drake Law, LLC, Auburn, for amicus curiae Maine Association of Criminal Defense Lawyers

Knox County Unified Criminal Docket docket number CR-2016-474
FOR CLERK REFERENCE ONLY